**THIRD DIVISION
RICKMAN, C. J.,
HODGES, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 30, 2023**

# In the Court of Appeals of Georgia

A22A1728. REID v. SAMSUNG SDI CO., LTD.

PHIPPS, Senior Appellate Judge.

Roymandal Reid sued Samsung SDI Co., Ltd. ("SDI") and The Vape Loft GA, LLC ("Vape Loft"), alleging that a battery manufactured by SDI and sold by Vape Loft exploded in his pocket, injuring him. SDI moved to disqualify Reid's attorney, Min J. Koo, who previously had worked for SDI's product liability insurer. The trial court granted the motion, finding that Koo's former employment created a relationship with SDI akin to an attorney-client relationship in which Koo was privy to confidential information about SDI relevant to this case. Reid filed an application for interlocutory appeal in this Court. We granted the application, and we now affirm the trial court's ruling.

Reid alleges that in 2018, he purchased from Vape Loft for use in an e-cigarette device a lithium-ion 18650 battery manufactured by SDI. The battery later exploded in his pants pocket, causing severe burns to his body. Reid alleges that SDI has been designing and manufacturing lithium-ion batteries since 2000 and "has been aware for more than a decade" that these batteries, including the 18650 battery, "have an inherent risk of fire and explosion," are used in e-cigarette devices, and are alleged to have caused fires and explosions. Reid further states that SDI "has faced hundreds of personal injury and property damage claims and lawsuits in the United States alone for more than a decade for their lithium-ion batteries, including 18650 batteries[.]" The complaint asserts claims for strict liability design defect, strict liability failure to warn, negligence, breach of warranty, punitive damages, and attorney fees and litigation expenses.

Reid is represented by attorney Koo. The record shows that from 2011 to 2017, Koo worked for Samsung Fire & Marine Insurance Co., Ltd. ("SFMI") as the "Head of Global Legal and Global General Counsel." During this period, SFMI provided "legal defense and coverage to SDI in relation to product liability claims arising out of its products, including 18650 lithium-ion battery cells[.]" SDI's insurance policy required it to "[c]ooperate with [SFMI] in the investigation, settlement or defense of

the claim or suit," and prohibited it from "voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ring] any expense, other than for first aid, without [SFMI's] consent." (Punctuation omitted.)

SDI filed a motion to disqualify Koo from representing Reid in this case "based on conflicts of interest and the significant likelihood that SDI's confidential and privileged information was obtained by Ms. Koo during her representation of SFMI and handling of the defense of SDI's claims." In support of its motion, SDI submitted an affidavit from Jaehyon Cho, who averred that he managed overseas claims and litigation for SDI and that Koo had handled a variety of product liability claims against SDI, including claims involving lithium-ion batteries generally and the 18650 battery specifically. According to Cho, "SDI personnel dealt with Ms. Koo in at least one e-bike claim, two laptop claims, and one e-cigarette claim, all of which allegedly involved 18650 lithium-ion battery cells." SDI's motion to disqualify also cited Koo's professional website, which advertised that her prior experience at SFMI made her "uniquely qualified for . . . helping injured individuals and their families," and Koo's appearance on a 2021 podcast in which she discussed how she is "now using [her insurance] expertise to help individuals on the other side," including working on a Samsung battery case.

Reid moved to strike Cho's affidavit, claiming that it was not based on personal knowledge because Cho did not work for SFMI and had no relationship with Koo. Reid also claimed that Cho's affidavit contained perjurious misrepresentations of Koo's role at SDI. In support of the motion, Reid submitted Koo's affidavit, in which she averred that she had acted as "coverage counsel" for SFMI, assigning cases to members of her department; that she generally did not handle cases directly; and that SDI was merely "one of hundreds of thousands of insureds" at SFMI. According to Koo, claims against SFMI's insureds were defended by the insureds' outside counsel, who had "full and complete control" over those claims, and "all SFMI insureds, including SDI, worked directly and closely with outside counsel in managing their own cases." Koo averred that SFMI's role was "to provide administrative claim support by ensuring litigation fees and expenses [we]re promptly paid and to financially indemnify the insured when settlements occur[red] or verdicts [we]re rendered." Koo denied working with Cho. Finally, Koo stated that SDI's insurance policy did not require it to share confidential or proprietary information with SFMI; that Koo had never received any "compromising information with regard to SDI's technology, production, manufacture, design, distribution, supply chains, marketing or use information about its 18650 lithium-ion batteries"; that any information or

4

document she received from SDI was shared at SDI's discretion without her solicitation; and that she had never received any reports from any SDI expert.

In response to Reid's motion to strike, SDI submitted a second affidavit from Cho averring that he had worked on at least four cases with Koo involving "product liability claims relating to 18650 battery cells used in laptops, power tool[s], and e-cigarette devices." Cho further averred that he had located at least 20 e-mails related to these cases that had been sent to Koo and contained confidential SDI information, and his affidavit attached redacted copies of those e-mails. SDI also submitted an affidavit from Jong Youn Kim, an SDI attorney "responsible for managing overseas claims and litigations" while Koo was at SFMI. Kim averred that Koo had worked on at least seven product liability cases involving the SDI 18650 battery and that he (Kim) had served as lead in-house counsel for many of these cases. Kim further averred that he and Koo were sent at least 70 e-mails related to these cases which contained SDI's confidential information. Kim attached redacted copies of these e-mails to his affidavit. Finally, SDI submitted an affidavit from attorney James Doyle, who averred that he had represented SDI, apparently as outside counsel, since 2012; that he had reported to SFMI on all matters for which he represented SDI; that he had sent or received multiple e-mails and documents pertaining to those cases; and that

5

Koo "was either directly communicated with or copied, as a representative of SDI's insurer, on all referenced e-mails and documents." Doyle attached redacted copies of these e-mails and documents to his affidavit. SDI provided to the trial court for in camera inspection unredacted copies of all documents attached to the affidavits, totaling approximately 350 pages.

Following a hearing, and after reviewing the documents submitted for in camera inspection, the trial court granted SDI's motion to disqualify Koo.[1] The court found that

> [i]n her role with SFMI, Ms. Koo routinely received detailed reports and information on a range of sensitive topics, both directly from SDI and through SDI's outside defense counsel. . . . [T]he information included private, privileged, and confidential information concerning SDI's and its outside counsel's analysis of the merits of claims against SDI and SDI's defenses, their assessment of potential exposure to SDI, and SDI's litigation and even settlement strategy. . . . SDI was required by its SFMI policy terms to fully cooperate with SFMI, and in practical terms, this meant SDI in-house and outside counsel shared confidential information and collaborated with SFMI and specifically with Ms. Koo, during her tenure with SFMI, about their liability analysis, inspection observations, and opinions held by SDI's consulting experts, causation and damage

[1] The appellate record contains no ruling on Koo's motion to strike Cho's first affidavit, and Koo does not raise this issue on appeal.

6

assessments, and litigation and settlement strategy, among other topics. Ms. Koo received SDI's confidential information in her prior employment as an attorney directly involved in the defense of SDI in similar litigation. She provided much more than administrative claim support in her role.

The court concluded that although Koo did not directly represent SDI, "her role as in-house counsel to SFMI was so akin to actual representation of SDI that we must apply the same analysis normally applied to assess whether prior representation of a client conflicts with present representation." Applying this analysis, the court ruled that "the only adequate method of protecting SDI's information is to preclude Ms. Koo from representing [Reid] against SDI." At Reid's request, the court certified its order for immediate review, and we granted his application for interlocutory appeal.[2]

Under Georgia law, "a lawyer is disqualified from representing a party against a former client in a matter that is 'substantially related' to the lawyer's prior representation." *Crawford W. Long Mem. Hosp. of Emory Univ. v. Yerby*, 258 Ga. 720, 721 (1) (373 SE2d 749) (1988). See also Rule 1.9 (a) of the Georgia Rules of

---

[2] Before the record was transmitted to this Court, SDI filed a motion in the trial court to file under seal the unredacted documents submitted for in camera review. The trial court granted that motion, and those unredacted documents are a part of the appellate record, accessible only to court staff, SDI, and its counsel.

7

Professional Conduct found in Bar Rule 4-102 (d) ("A lawyer who formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."). Further, lawyers are required to "maintain in confidence all information gained in the professional relationship with a client, including information . . . the disclosure of which . . . would likely be detrimental to the client[.]" Rule 1.6 (a) of the Georgia Rules of Professional Conduct found in Bar Rule 4-102 (d). See also Rule 1.9 (c) (1) ("A lawyer who has formerly represented a client in a matter . . . shall not thereafter . . . use information relating to the representation to the disadvantage of the former client[.]"); *Crawford W. Long Mem. Hosp.*, 258 Ga. at 721 (1), n. 1 (a lawyer may neither "disclose confidences or secrets of the former client" nor "nor use them adversely to that client").

The party seeking disqualification of an attorney based on prior representation has the burden of showing a substantial relationship between the prior and current matters. *Shuttleworth v. Rankin-Shuttleworth of Ga.*, 328 Ga. App. 593, 595 (1) (759 SE2d 873) (2014). Courts should

approach motions to disqualify with caution due to the consequences that could result if the motion is granted, such as the inevitable delay of the proceedings and the unique hardship on the client including the loss of time, money, choice of counsel, and specialized knowledge of the disqualified attorney.

*Ga. Trails and Rentals v. Rogers*, 359 Ga. App. 207, 213 (1) (855 SE2d 103) (2021) (citation and punctuation omitted). Deciding whether to disqualify counsel requires "balancing the need to ensure ethical conduct on the part of lawyers appearing before the court and other social interests, which include the litigant's right to freely chosen counsel." Id. (citation and punctuation omitted).

We review for abuse of discretion a trial court's ruling on a motion to disqualify counsel, recognizing that "the trial court sits as the trier of fact, resolving conflicts in the evidence and assessing witness credibility." *Samnick v. Goodman*, 354 Ga. App. 805, 806 (841 SE2d 468) (2020). "Under an abuse of discretion standard of review, we are to review the trial court's legal holdings de novo, and we uphold the trial court's factual findings as long as they are not clearly erroneous, which means there is some evidence in the record to support them." *Rosser v. Clyatt*, 364 Ga. App. 101, 101 (874 SE2d 140) (2022) (citation and punctuation omitted). With this legal backdrop, we turn to Reid's arguments.

9

1. Reid first argues that SDI lacks standing to seek Koo's disqualification because it did not have an attorney-client relationship with her. We conclude that SDI does have standing to seek Koo's disqualification.

Reid cites *Johnson v. Prime Bank*, 219 Ga. App. 29 (464 SE2d 24) (1995) (physical precedent only), in which the plaintiff sought to disqualify the defendants' attorneys on the ground that they "may have a conflict of interest in representing" both corporate and individual defendants. Id. at 31 (2). We held that the plaintiff lacked standing to bring a motion to disqualify because she had no attorney-client relationship with defense counsel. Id.; see also, e.g., *Piedmont Hosp. v. Reddick*, 267 Ga. App. 68, 77 (7) (c) (599 SE2d 20) (2004) ("[T]he objection that an attorney is disqualified by reason of his representing adverse interests is available only to those as to whom the attorney in question sustains, or has sustained, the relation of attorney and client.").

*Johnson* and decisions like it are distinguishable because they involve motions for disqualification filed by parties who lacked any relationship with opposing counsel; rather, the movants sought disqualification based on alleged conflicts of interest arising from attorney-client relationships between opposing counsel and other entities. In this case, however, SDI seeks Koo's disqualification based on its *own*,

rather than another entity's, relationship with her. We therefore conclude that SDI has standing. See *Black Voters Matter Fund v. Kemp*, 313 Ga. 375, 381 (1) (870 SE2d 430) (2022) (in general, a party has standing when it has suffered an adverse impact to its own rights).

2. Reid next contends that the trial court erred by finding that Koo had a de facto attorney-client relationship with SDI. Again, we disagree.

(a) It is undisputed that Koo had no formal attorney-client relationship with SDI.[3] Nevertheless, as noted, the trial court determined that her role as in-house counsel to SDI's insurer was "so akin to actual representation of SDI" that it could be considered an attorney-client relationship for the purpose of the disqualification analysis. In the absence of any Georgia authority on point, the trial court turned to federal case law holding that a formal attorney-client relationship is not a prerequisite for seeking disqualification based on a conflict of interest. Like the trial court, we find this authority persuasive.

---

[3] Accordingly, Reid's argument that an insurance policy does not automatically establish an attorney-client relationship is beside the point. As discussed infra, the question here is not whether SDI's insurance policy with SFMI created a formal attorney-client relationship, but whether the trial court abused its discretion by finding the functional equivalent of such a relationship under the facts of this case.

11

The trial court relied on *Ramada Franchise System v. Hotel of Gainesville Assoc.*, 988 FSupp. 1460 (N.D. Ga. 1997), in which Ramada sued a former franchisee for breach of a license agreement. Ramada moved to disqualify the defendant's attorney and his law firm, even though they had never formally represented Ramada, "because of their prior representation of a sister corporation of [Ramada]." Id. at 1462 (I). The federal district court cited the legal standard applicable under Georgia law to disqualify an attorney based on prior representation: "[T]he party seeking disqualification must prove it once had an attorney client relationship with the opposing lawyer and that the subject matter of the two transactions is substantially related." Id. at 1463 (I) (citation and punctuation omitted). In determining whether a prior attorney-client relationship existed, the court explained,

> the focus is not on whether the relationship at issue is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict. The adverse interests at stake, therefore, do not have to be those of a "client" in the traditional sense.

Id. (citations and punctuation omitted). According to the court, the analysis should be a "pragmatic approach which takes the relationships of the parties into account," rather than a narrow focus on labels or "the exaltation of form over substance." Id. at

12

1465 (I) (A) (2). Based on evidence that Ramada and its sister corporation shared counsel, management personnel, headquarters, and corporate ethos, the district court ruled that there was an "identity of interest" between the two companies "for the limited purpose of determining whether there was a conflict requiring disqualification of defendants' counsel." Id.[4]

The trial court also cited *Blue Planet Software v. Games Intl.*, 331 FSupp.2d 273 (S.D.N.Y. 2004), which is factually similar to this case. There, Blue Planet sued Elorg Company, LLC and another defendant over the rights to the video game *Tetris*. Blue Planet's attorney previously had represented Nintendo of America, Inc. in a separate action over rights to the game. Id. at 274 (I). A predecessor of Elorg (the current defendant) had cooperated with Nintendo in defending against the prior suit pursuant to a licensing agreement requiring such cooperation, and "various letters between the two parties demonstrate[d] their mutual interest" in Nintendo winning that case. Id. at 274 (II). Elorg moved to disqualify Blue Planet's attorney based on his "substantial access" to Elorg's predecessor's confidential documents while

---

[4] The court ultimately determined that disqualification was not warranted because there was no substantial relationship between the prior representation and the current litigation. 988 FSupp. at 1465-1466 (I) (B).

representing Nintendo. The federal district court ruled that "an attorney . . . may be disqualified despite the lack of a formal attorney-client relationship." Id. at 276 (III) (A) (1). The court observed that disqualification is appropriate

> when an attorney gains access to the confidences even of someone who is not formally a client. . . . [A]n attorney may be disqualified from representing interests adverse to a non-client where the close and indeed symbiotic relationship between the non-client and the actual client, quite naturally encouraged confidential discussions with the attorney and the exchange of confidential information which the non-client would not otherwise have imparted.

Id. (citation and punctuation omitted). Given the attorney's prior representation of a party that received confidential information from the defendant pursuant to a contractual obligation to cooperate, the district court concluded that

> plaintiffs would have much to gain from [the attorney's] knowledge of [the defendant's] confidential documents and discussions with high level [defendant] employees about their respective rights. That such confidences were exchanged during the interactions between [the attorney] and [the defendant] is presumed because for the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule.

Id. at 277 (III) (A) (1) (citation and punctuation omitted).

14

In *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F2d 1311 (7th Cir. 1978), the federal appellate court addressed a situation even more like the one presented here, holding that "[w]hen an insurer retains an attorney to investigate the circumstances of a claim and the insured, pursuant to a cooperation clause in the policy, cooperates with the attorney, the attorney may not thereafter represent a third party suing the insured[.]" Id. at 1319 (III). The United States District Court for the Northern District of Georgia cited *Westinghouse* with approval in its unpublished opinion in *Jones v. InfoCure Corp.*, No. 1:01-CV-2845-TWT, 2003 WL 22149656 (N.D. Ga., May 13, 2003), which granted a motion to disqualify counsel who previously had received relevant confidential information from the opposing party pursuant to a cooperation agreement. Id. at *2-4 (III) (A)-(B). See also *Dansko Holdings v. Benefit Trust Co.*, No. 16-324, 2017 WL 5593321, at *4 (III) (B) (E.D. Pa. 2017) (holding that communications between an insured and an insurance carrier "are privileged if the communications are necessary to procure and/or provide the representation in a manner necessary to maintain the availability of coverage and/or effectuate strategy and tactics of counsel") (citation and punctuation omitted).

We are persuaded by the reasoning in these cases and conclude that disqualification of an attorney based on prior representation may be appropriate in the

15

absence of a formal attorney-client relationship if (i) sufficient aspects of such a relationship exist and (ii) there was a mutuality of interest that encouraged the disclosure of confidential information in a prior case or cases that the party seeking disqualification otherwise would not have imparted. See *Blue Planet Software*, 331 FSupp.2d at 276 (III) (A) (1); *Ramada Franchise System*, 988 FSupp. at 1463 (I). We emphasize that this is a pragmatic, case-specific inquiry and that "in making its determination a court should sift the facts and circumstances involved." *Ramada Franchise System*, 988 FSupp. at 1464 (I) (A) (2).

(b) Turning to the facts of this case, Reid maintains that Koo's minimal interactions with SDI did not rise to the level of an attorney-client relationship. Reid contends that Koo only occasionally received status reports about cases, never appeared as SDI's lawyer, never gave legal advice to SDI, was not compensated by SDI or its outside counsel, and provided no indispensable service to SDI or its outside counsel. Accordingly, Reid asserts that the trial court erred by finding that SDI was the functional equivalent of Koo's former client. The record, however, contains evidence to support the trial court's decision. See *Rosser*, 364 Ga. App. at 101 (under the abuse of discretion standard, we uphold a trial court's factual findings if there is any evidence in the record to support them).

16

SDI submitted evidence that during Koo's tenure at SFMI, she oversaw seven product liability cases involving the use of SDI's 18650 battery in laptops, power tools, e-bikes, and e-cigarettes. In one e-cigarette case that Koo worked on, the plaintiff alleged — as Reid does here — that a battery he purchased at a vape store exploded in his pocket. Although a "junior professional" was the main point of contact at SFMI in that case, Koo was copied on correspondence concerning the factual background of the case, identification of the battery in question, the defense expert's analysis of the incident, litigation strategy, and settlement negotiations. Along with outside counsel, Koo attended a mediation in the case. According to SDI's in-house counsel, "[n]o SDI employees attended this mediation and Min Koo was therefore in sole control of the strategy at the mediation and responsible for instructing outside counsel." Before the mediation, outside counsel shared with Koo a document titled "Privileged Mediation Brief" outlining the factual background of the case, defense arguments, and settlement negotiation history.

Koo also worked directly on a case involving a laptop with an SDI 18650 battery that allegedly caught fire. Koo requested regular case updates from outside counsel, sent reminder e-mails when reports were late, and offered to assist outside counsel if needed. Outside counsel responded to one of Koo's requests for an update

17

by forwarding her a report he had recently sent to SDI's in-house counsel, along with the assurance, "I will make certain that you are included on all future correspondence." That correspondence included information about the cause of the fire, discussions with co-defendants' counsel, discovery strategy, settlement offers, and evaluations of SDI's potential exposure and defenses. Koo again attended a mediation, during which she commented on an issue in the case and after which she made recommendations about settlement strategy. E-mail correspondence indicates that Koo also assisted outside counsel in preparing SDI's witnesses for depositions.

Koo apparently served as the principal SFMI contact in another laptop case, as SDI's in-house counsel told outside counsel, "[P]lease do address Min Koo going forward as the primary recipient — she will be in charge of overseeing the lawsuit." Koo thereafter received status reports containing details about litigation strategy and settlement negotiations. Outside counsel consulted Koo about SDI's proposed answer in the case and telephoned her to discuss it. In addition, there is evidence that Koo assisted outside counsel in retaining and/or communicating with SDI's expert witness.

Koo was also copied on numerous e-mails related to other SDI 18650 battery cases for which junior SFMI employees were the principal contacts. In an e-bike case,

18

for example, Koo received reports from outside counsel concerning a site inspection, the defense expert's conclusions, and outside counsel's evaluation of SDI's potential liability exposure and recommended next steps in the litigation. Koo was also copied on e-mails consulting with the junior SFMI employee under her supervision about settlement authority and whether certain investigations were needed. In another laptop case, Koo was copied on e-mails from a junior SFMI employee concerning clarification and further explanation of outside counsel's suggested legal strategy. And in a case involving a power tool, Koo was copied on emails containing internal information about the 18650 battery.

Reid argues that Koo never asked for any confidential information from SDI or sought to be included in SDI's communications with outside counsel. However, the e-mails submitted by SDI show that Koo herself requested information from outside counsel on several occasions, and Reid acknowledges that, as a matter of business practice, SFMI was routinely copied on status updates from outside counsel to in-house counsel. These status updates often included information about the battery in question, litigation strategy, and settlement negotiations. Although Reid insists that Koo was merely a passive recipient of such information, there is evidence that she played an active role in several cases by attending mediations, preparing witnesses

for deposition, communicating with defense experts, and recommending and authorizing settlement amounts. And in the 18650 battery cases in which Koo did not play an active role, it appears that she supervised other SFMI employees who did so. In light of this evidence, the trial court was authorized to reject Reid's claims of Koo's minimal, passive involvement.

In any event, as SDI points out, even if Koo's only role was to approve and process settlements,"[i]t defies logic that Koo and SFMI could make any decisions about whether and how much to pay a plaintiff in a product liability suit without understanding the case's merits, any liability defenses, expert analysis/conclusions, strategy around whether or when to file a dispositive motion, etc." Thus, even accepting Koo's limited description of her role, it appears that she was, indeed, "part of the 'defense team,'" despite her insistence to the contrary. Accordingly, the trial court did not abuse its discretion by concluding that Koo's tenure at SFMI was "so akin to actual representation of SDI" that traditional disqualification analysis applies.

3. Finally, Reid argues that the trial court erred by finding a substantial relationship between the instant case and the 18650 battery cases that Koo worked on at SFMI. Based on the evidence before the trial court, we find no error.

"To be substantially related for the purpose of assessing the need for disqualification means that the former case in which the lawyer was involved has both material as well as logical connections to the pending litigation[.]" *Cardinal Robotics v. Moody*, 287 Ga. 18, 21 (694 SE2d 346) (2010) (citation, punctuation, and emphasis omitted). See also *Befekadu v. Addis Intl. Money Transfer*, 332 Ga. App. 103, 106-107 (1) (c) (772 SE2d 785) (2015) (citing Comment 3 to Rule 1.9 (a) of the Georgia Code of Professional Conduct found in Bar Rule 4-102 (d) (matters are substantially related "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter")). Simply put, a court should consider whether "the subject matter of both cases 'overlapped.'" *Carragher v. Harman*, 220 Ga. App. 690, 692 (1) (469 SE2d 443) (1996).

Applying these legal principles here, there is evidence of a substantial connection. This case and Koo's seven 18650 battery cases during her time at SFMI are all product liability actions centering on alleged explosions of the same type of battery. One of Koo's prior cases from SFMI presented the same factual scenario that Reid alleges here — an 18650 battery purchased from a vape store for use in an e-

21

cigarette allegedly exploding inside the plaintiff's pants pocket. As discussed above, while working on these cases at SFMI, Koo received information about technical aspects of the battery and SDI's operations, as well as details about litigation strategy, expert witnesses, and settlement approaches. Thus, Koo had access to a great deal of confidential information to which she would not otherwise have been privy — information that is highly relevant to the issues in this case and that could afford Reid an unfair advantage in this litigation. See *Jones*, 2003 WL 22149656 at *4 (III) (B) ("If the 'substantial relationship' test is met, the Court is to assume that confidences were disclosed during the course of the prior representation and will not so inquire.").

Reid's main argument against the existence of a substantial relationship is that Koo stopped working for SFMI in 2017, the year before he bought the battery at issue here. Koo cites *Cramer v. Spalding County*, 261 Ga. 570, 571 (1) (409 SE2d 30) (1991), in which the Supreme Court held that "[d]isqualification is limited to cases where the lawyer was actively representing the party when the events giving rise to the case in question occurred." (Citation and punctuation omitted). However, according to Reid's own complaint, many of the events giving rise to his claims occurred while Koo was at SFMI. The same kind of battery that allegedly injured Reid was being manufactured — and litigated — during Koo's tenure at SFMI. Reid

22

claims that SDI has known about this battery's risks for "more than a decade" and has faced "hundreds" of prior tort claims related thereto. Because Reid's allegations concerning design, manufacture, and knowledge of danger span the time period in which Koo worked at SFMI on similar cases, the Supreme Court's holding in *Cramer* does not help Reid's position and does not foreclose Koo's disqualification.

In sum, we are mindful of Reid's right to counsel of his choice and the potential hardships he may face in finding replacement counsel. See *Ga. Trails and Rentals*, 359 Ga. App. at 213 (1). Nevertheless, given the evidence presented here concerning Koo's prior work at SFMI, we cannot say that the trial court abused its discretion by disqualifying her from representing Reid in this case.

*Judgment affirmed. Hodges, J., concurs and Rickman, C.J., concurs in judgment only.*